UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHRISTINA L. MOREY,                       :
        Plaintiff,                    :
                                  :
        v.                            :       C.A. No. 14-433M
                                  :
CAROLYN W. COLVIN, ACTING                 :
COMMISSIONER OF SOCIAL SECURITY,          :
        Defendant.                    :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

        Plaintiff Christina L. Morey, a young woman suffering from anxiety, depression and polysubstance abuse, asks this Court to reverse the decision of the Commissioner of Social Security (the "Commissioner") denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). She contends that the Administrative Law Judge ("ALJ") committed reversible error by independently interpreting raw data beyond the ken of a lay person, by failing properly to evaluate the opinions of the testifying medical expert, the state agency reviewing psychologists and her treating sources, and by improperly discounting her credibility. Defendant Carolyn W. Colvin ("Defendant") has filed a Motion for an order affirming the Commissioner's decision. This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the entire record, I find neither legal error nor material factual mistake. Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 7) be DENIED and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

## I.    Background

### A.    Plaintiff's Characteristics

Plaintiff is a "younger individual."  She was thirty-two years old when the ALJ rendered

his adverse decision.  Tr. 29, 52, 264.  She had completed some college and worked as a sales

representative, waitress and veterinary technician.  Tr. 29, 81, 269.  On her alleged onset of

disability in October 2008, she stopped working after she was fired by the veterinarian for being

"late all the time."  She claims she cannot work because leaving the house causes excessive

anxiety and because she is obsessive about hand-washing, cleaning and other tasks.  Tr. 54-55,

74, 80.  Her relationships with members of her family are also a source of anxiety; nevertheless,

she lives with family, at times with her parents and at times with a grandmother or with an aunt,

depending on the level of conflict.  Tr. 52, 334.  Despite the claim that she rarely leaves the

home, the record reflects that during the period of alleged disability she went out weekly to help

her grandmother, gardened, occasionally shopped, cared for the family dog by walking it outside

(usually at night to avoid seeing other people) and, except for a two year hiatus, went to church

and sang in the church choir.  Tr. 28, 59, 70-73, 286-88.  She also washes dishes, does laundry,

vacuums, cleans and prepares simple frozen and canned meals.  Id.  In addition to spending time

with her family, she socializes with her best friend and with her boyfriend of eleven years.  Tr.

70, 290.

As reflected in the record, Plaintiff has been hospitalized twice for psychiatric and

substance abuse issues: the first time was prior to onset while she was still working when she

was admitted to Butler Hospital in January 2008; and the second was an admission to Kent

Hospital in October 2011.  Tr. 333-38, 374-411.  At Butler, substance abuse was the primary

diagnosis, while the Kent hospitalization was related to substance abuse in that it was initiated as

an involuntary certification by her family, triggered by her ingestion of her aunt's Vicodin.  Tr. 336, 388, 408.  Apart from these episodes, virtually all of her mental health treatment has been limited to medical management appointments with nurses, physician's assistants and social workers at Thundermist Health Center ("Thundermist") and several months of substance abuse counseling at the Kent Center in 2009 and early 2010.  Tr. 347-71, 420-551.  Three months before the hearing on her applications, she switched from Thundermist to Quality Behavioral Health ("QBH"), where she started treating with a psychiatrist and started counseling with a nurse.  Tr. 557-79.

Plaintiff has a long list of mental health diagnoses and claimed impairments.  They include sleep apnea, chronic fatigue syndrome, attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, anxiety disorder, mood disorder, depressive disorder, obsessive compulsive disorder ("OCD"), polysubstance dependence (alcohol, cannabis, amphetamines and tobacco) and long-term use of medications.  Tr. 21, 147, 149, 421.

### B.    Plaintiff's Prior Applications

These are Plaintiff's second set of applications; because the issues presented in her first set arguably are still in issue, they are described here in detail.  With the assistance of an attorney, she initially applied for DIB on February 23, 2009, and for SSI on April 26, 2010, claiming that she had been unable to work since October 24, 2008.  Tr. 144.  The first ALJ found that she had an array of severe impairments: ADHD, mood disorder, depressive disorder, anxiety, OCD and polysubstance abuse (alcohol, cannabis and amphetamines).  Tr. 147.  In the prior applications, Plaintiff claimed that she had difficulty leaving her house because she is embarrassed to be seen and she gets sidetracked by obsessions like the need to clean or wash her hands.  Tr. 148.  According to the prior record, before onset, she worked for three years as a

veterinarian's technician and for six years in sales at Macy's; after onset, she continued to work, caring for the child of a friend and cleaning houses.  In addition, she kept active by singing in the church choir, doing chores at home and caring for the dog.  Tr. 56-57, 148-49.

The first set of applications reflected serious alcohol abuse early in the period of alleged disability, with reduced use but not total sobriety later in the period; the record also reflected regular use of marijuana, occasional use of opiates taken from family and friends and overuse of prescribed Adderall.[1]  Tr. 149.  A testifying medical expert opined that Plaintiff's medications were not properly prescribed or used, noting that Klonopin should never be mixed with alcohol, that Adderall should not be used to get up in the morning and that Plaintiff's overuse of Adderall may be the cause of her obsessive behaviors.  Id.  Because significant doses of prescribed medication mixed with various non-prescribed substances (alcohol, marijuana and opiates) could be the cause of many of her symptoms, this medical expert concluded that Plaintiff's substance abuse needed to be treated before any psychiatric diagnosis could be rendered.  Tr. 150.  Relying on Global Assessment of Functioning ("GAF") scores ranging from 48 to 60,[2] mental status examination results largely within normal limits, and discounting her credibility based on lies to

---

[1] Adderall is a prescription medication of mixed amphetamines approved for the treatment of ADHD.  Shire LLC v. Watson Pharm., Inc., No. 11 CIV. 2340 JPO, 2012 WL 4477605, at *1 (S.D.N.Y. Sept. 25, 2012).  In the United States, amphetamine is a Schedule II prescription drug, classified as a central nervous system stimulant.  United States v. Corona, 125 F.3d 863 (10th Cir. 1997); Ortiz v. Overland Express, 237 P.3d 707, 712 (N.M. 2010).

[2] The Global Assessment of Functioning ("GAF") scores relevant to this case are in the 51 – 60 range, which indicates "moderate difficulty in social, occupational, or school functioning," the 41 – 50 range, which indicates "serious impairment in social, occupational, or school functioning," and the 21 – 30 range, which indicates "inability to function in almost all areas."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  While GAF scores were still in use during Plaintiff's treatment, "[i]t bears noting that a . . . [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")).  In response, the Social Security Administration ("SSA") released an Administrative Message (AM–13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders."  It makes clear that adjudicators may continue to receive and consider GAF scores.  See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited Oct. 5, 2015).

treatment providers, overuse of prescribed Adderall and use of opiates taken from family members, the prior ALJ found that Plaintiff was not disabled from October 24, 2008, to the date of her decision (August 8, 2011). Tr. 150-152. In light of this finding, no analysis of the materiality of substance abuse was performed. Tr. 154.

### C.     Plaintiff's Mental Health Treatment

The medical record associated with the current applications begins on January 29, 2008, prior to Plaintiff's 2008 onset date, with her admission to Butler Hospital, beginning as an in-patient, and then in the day program. Tr. 334, 338. She was treated for complaints of "mood lability, feelings of hopelessness, alcohol dependence, and amphetamine and opio[i]d abuse." Tr. 334. At discharge, her GAF score was assessed at 51, polysubstance abuse was the primary diagnosis and a mental status examination was "unremarkable," including observations that her attention/concentration was "attentive to interview," her affect/mood was "ok, [a]ffect congruent and reactive with mood" and her insight/judgment was "improved." Tr. 335-36. Alcohol withdrawal symptoms had resolved by the time of discharge. Tr. 334. Although she had been prescribed Adderall prior to admission, it was not prescribed by the physicians at Butler; at discharge, amphetamine dependence was one of her secondary diagnoses. Tr. 336-37.

For most of the period of alleged disability, from December 2008 until February 2013, Plaintiff received mental health treatment from nurses, physician's assistants and social workers at Thundermist; these visits were generally once a month for "medication management," principally with a nurse, Cynthia Jankowski. Tr. 422-512, 518-31, 536-49. The treatment notes show that Plaintiff was anxious and her thought process was obsessive, but she was otherwise cooperative, well-groomed, fully oriented, with "good" attention, "fair" insight and judgment and intact and logical thought process; she was assigned GAF scores generally ranging from 55

to 60, with an occasional dip to 50.  Tr. 422-28, 466-84, 518-31.  At times, providers recorded

that she was "feeling well . . . happy to be feeling better," "feeling very strong and happy" and

"remains actively involved w/ her [c]hurch-attending mass, choirs and other church related

activity," while they also observed that her "hands appeared red and irritated" from use of

cleaning wipes.  Tr. 440, 442, 448, 468.  In January 2011, Plaintiff told Nurse Jankowski that she

was feeling well, with good mood, and was reunited with an old childhood friend for whom she

was planning to babysit.  Tr. 446.  Despite Thundermist's recognition that "amphetamine abuse-

unspec" was one of her "active problems," Tr. 421, throughout her treatment at Thundermist by

an array of providers (none of whom is an "acceptable medical source"), her prescription for

Adderall was continued.  Thundermist records do not reflect that providers believed that Plaintiff

needed more intensive mental health treatment.

In addition to medication management at Thundermist, from October 2009 through

January 2010,[3] Plaintiff received substance abuse counseling at the Kent Center.  Tr. 347-71.

Her GAF improved from 45 to 55 over the course of treatment.  Tr. 347.  The principal focus of

these therapy notes is on recovery from substance abuse and managing relationships with family

members.  At each session, a mental status examination was conducted by the therapist; while

most findings were normal, the therapist also occasionally observed anxious mood, over-

talkative, fast speech and obsessive thoughts.  He sometimes recorded that he suspected

substance abuse.  Tr. 350, 354-55, 358-59.  On at least one such occasion, Plaintiff denied it.  Tr.

359.

In October 2011, Plaintiff was taken to the Kent Hospital emergency room by the police

after her mother called because she had been behaving strangely and ingested Vicodin taken

---

[3] There is an unexplained discrepancy in the record regarding the length of this counseling treatment.  The notes reflect that Plaintiff participated in counseling sessions from October 2009 through January 2010, but the Kent Center discharge summary reflects an admission date of January 20, 2009.  Tr. 347.

from her aunt.  Tr. 378-82, 403.  Initially, she was certified for involuntary admission, but was transferred voluntarily to Butler Hospital's Psychiatric Care Unit where she remained for three days.  Tr. 378, 380, 407.  She told the staff that she did not really intend to commit suicide, but was having trouble managing her moods and impulsive behavior and had not taken any of her medications for two days.  Tr. 378, 393.  Butler doctors determined that they would "hold her Adderall but continue her other routine medications to avoid abrupt withdrawal."  Tr. 381.  At discharge, Plaintiff was pleasant and cooperative, with clear and goal-directed thoughts, appropriate affect, good mood and improved insight and judgment, but some psychomotor anxiety/agitation; her discharge diagnoses included history of bipolar, generalized anxiety and social anxiety disorders, in addition to alcohol abuse, with a GAF around 50, and a highest GAF in past year of 55-60.  Tr. 378-79.

In March 2013, Plaintiff stopped going to Thundermist and began treatment at QBH with psychiatrist Dr. Gene Jacobs and Nurse Jan Denuccio.  Tr. 560-83.  Other than during her hospitalizations, Dr. Jacobs appears to be the first psychiatrist involved with her treatment; her initial appointment with him was on March 21, 2013,[4] at which time he administered some tests and took a clinical interview.  Tr. 559-61.  Plaintiff told him that her last marijuana use had been two weeks prior and that she was using alcohol weekly; he diagnosed bipolar, mood and anxiety disorders, with alcohol dependence and marijuana abuse.  Tr. 560-61.  He assessed her GAF at 50.  Tr. 561.  He noted that she is "using Adderall to chase Luvox not treating the underlying bipolar" and began to taper her off it; his treatment recommendations included participation in a woman's group and counseling.  Tr. 561.

---

[4] In her brief, Plaintiff states that this appointment was on March 27, 2013, and not on March 21, 2013.  While far from clear, the handwritten date on the treating record appears to be "March 21."  Tr. 561.  I have used that date in the text.

On the next day (March 22, 2013), Plaintiff saw Nurse Denuccio of QBH for the first time.  Tr. 576.  Plaintiff told Nurse Denuccio that she had sustained a good relationship with her boyfriend for eleven years and that she had a history of gambling, gets depressed in spring and summer, and recently had a panic attack while at church singing in the choir.  Tr. 576.  On examination, Nurse Denuccio observed withdrawn manner, hypoactive motor activity, worried, tearful, anxious and depressed mood, thoughts of compulsions, phobias and obsessions, and fair judgment.  Tr. 578.  Although there is no reference to any observation or testing by Nurse Denuccio of Plaintiff's ability to concentrate or attend, she recorded a diagnosis of ADHD.  Tr. 577.  Before seeing Plaintiff again, Nurse Denuccio completed an Residual Functional Capacity ("RFC")[5] opinion form on April 10, 2013.  Tr. 552-55.

When Plaintiff went back to Dr. Jacobs for the second visit on April 25, 2013, his notes state, "not attuned well to reality – wants Adderall despite very high bp, doesn't connect dots."  Tr. 557.  His notes record that testing during the prior appointment resulted in the findings that her depression is moderate but her anxiety is extreme; he also noted "severe cognitive distortions."  Tr. 557.  At this, the second appointment, he too completed an RFC opinion form.  Tr. 580-83.

### D.    Plaintiff's Substance Abuse

A complexity woven through the facts of this case is Plaintiff's substance abuse.  From the first ALJ's decision, it appears that early in the period of alleged disability, she had been drinking alcohol to excess, but had reduced her use to a few drinks a week, which continued throughout the period.  Throughout the period, she continued regular use of marijuana and periodically took (presumably stole) Vicodin and Percocet from family members.

---

[5] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

Also throughout the period, Plaintiff continued what many of the treating sources and state agency medical experts have opined is inappropriate use of prescribed Adderall, particularly when used in combination with the sedative medication.  Tr. 48-50 (describing adverse effects of mixing prescribed medications, including Adderall and Klonopin); Tr. 149-50 (significant doses of various medications not properly prescribed; attention deficit medication [Adderall] is overprescribed).  Yet Nurse Jankowski continued to prescribe it, although other treatment providers did not.  Tr. 149; see Tr. 334-36 (Butler providers address amphetamine and opioid abuse; Adderall not prescribed); Tr. 381 (Kent providers to "hold her Adderall but continue other medications to avoid any abrupt withdrawal"); Tr. 557 (Dr. Jacobs opines, "pt not attuned to reality – wants Adderall despite very high bp, doesn't connect dots").  Even Nurse Jankowski's treating notes reflect concern about Plaintiff's use of so much Adderall.  Tr. 426-27 ("Pt reports disability physicians feels her mental health issues are due to substance use w/ adderall so I explained to the pt the benefits of decreaaing [sic] the dose to disprove their allegations and she reluctantly agreed . . . .  Feels she will not get [out of bed] or function w/out Adderall."); Tr. 428 ( "acciedently [sic] threw away her Adderall while cleaning . . . .  I refusex [sic] to give an early refill . . . .  Explained it was at max dose").  Dr. Jacobs's notes reflect his opinion of the clinical inappropriateness of Adderall for Plaintiff.  Tr. 557, 561.  At the hearing, she testified that he had finally taken her off it.  Tr. 63.

Both ALJs deemed Plaintiff's substance abuse sufficiently complex as to require testifying medical experts; both of the medical experts opined that the mix of prescribed medications, particularly Adderall in combination with sedatives, coupled with ongoing use of alcohol, marijuana and occasional opiates, could account for some or most of her symptoms, so that neither was able to opine to any impairment other than substance abuse.  Compare Tr. 149-

50 (at first ALJ hearing, Dr. Ruggiano testified that Adderall could cause obsessions, significant doses of central nervous system medications could cause inability to leave house, medications were not properly prescribed, and substance abuse must be treated before any psychiatric diagnosis could be rendered), with Tr. 42-45 (at second ALJ hearing, Dr. Gitlow testified that polysubstance abuse is only supportable diagnosis, in light of ongoing use of alcohol and marijuana, coupled with prescriptions for unusual combination of stimulants and sedatives simultaneously, which would cause side effects of both but benefits of neither).  And both ALJs ultimately found that Plaintiff's RFC was sufficiently intact as to support a finding of not disabled, so that the secondary analysis of the materiality of substance abuse was not necessary.[6] Tr. 22 & n.1, 148.

### E.    Opinion Evidence

During the period covered by the first set of applications, in June 2009, Plaintiff underwent a consultative examination with state agency psychologist Dr. Louis Turchetta.[7]  Tr. 342-45.  During the clinical interview, Plaintiff told Dr. Turchetta that she feels depressed most of the time, that her OCD symptoms include carrying wipes to clean her hands, and that she has extreme anxiety about completing tasks or leaving home except at night.  Tr. 343.  She described her use of alcohol and marijuana, but said it had declined since late 2008.  Tr. 343.  On mental status examination, Dr. Turchetta noted that she arrived on time, was appropriately dressed, able

---

[6] This case potentially presents the difficult issue whether Plaintiff's use of prescribed Adderall in combination with prescribed sedatives should be analyzed as if it amounts to substance abuse or whether it should be interpreted as prescribed medications causing side effects that limit functionality.  See SSR 13-2p, 2013 WL 621536, at *3 (Feb. 20, 2013) (substance abuse is "maladaptive patterns of substance use that lead to clinically significant impairment or distress").  This Court need not struggle to resolve this conundrum where, as I conclude in this report and recommendation, there is no error in the ALJ's finding that – whatever the cause, whether substance abuse or the side effects of prescribed medications or the consequence of an underlying mental health impairment – Plaintiff's functional limitations are moderate and leave her able to work.

[7] The first ALJ's decision reflects that she received opinion evidence from Dr. Turchetta, from a reviewing psychologist, the testifying medical expert and Nurse Jankowski of Thundermist.  Tr. 152.  Apart from Dr. Turchetta's report, none of this opinion evidence is in the record, although it is described and discussed in the first ALJ decision.  Tr. 149, 151, 152.

to maintain eye contact, easily established a rapport and had normal gross and adequate fine motor skills; he found that her thought processes were abstract, with no flight of ideas, that she was able to express herself, that her comprehension and memory were in normal limits and that she could maintain attention and concentration, including task persistence and appropriate frustration tolerance.  Tr. 343-44, 346.  His only objective negative finding was that her judgment of social situations appeared below normal due to anxiety.  Tr. 344.  Based on Plaintiff's self-report, he noted a "significant level of emotional discomfort" and recorded diagnoses of alcohol dependence, polysubstance dependence, major depressive disorder and OCD, with a history of ADHD, and a guarded prognosis.  Tr. 344-45.  He assessed a GAF score of 48, highest 52.  Tr. 345.  In making these findings, he emphasized that his contact with Plaintiff was limited to a single session.  Tr. 345.

On July 17, 2012, state agency psychologist Dr. Clifford Gordon reviewed the available evidence and completed a Psychiatric Review Technique ("PRT").  Tr. 92-96, 104-08.  He opined that Plaintiff has moderate limitations in activities of daily living, social functioning and maintaining concentration, persistence, or pace, and had experienced one or two episodes of decompensation.  Tr. 96, 108.  In his RFC assessment, he opined that Plaintiff could perform basic, simple, routine, repetitive and familiar tasks in two-hour blocks of time, relate adequately with coworkers and supervisors if contact was superficial/minimal and adapt to ordinary changes in the work environment, but could not perform detailed/complex tasks or relate adequately with the public.  Tr. 98-99, 110-11.  On October 18, 2012, a second state agency psychologist, Dr. Jeffrey Hughes, reviewed the updated record, including Plaintiff's statement about her worsening condition; finding it "rather loquacious" and not supported by the medical evidence, he affirmed the PRT and RFC findings of Dr. Gordon.  Tr. 118-24, 131-37.

Several months before the hearing, Plaintiff procured opinions from the two sources at QBH with whom she had just started treating.  First, after a single interaction with Plaintiff on March 22, 2013, Nurse Denuccio completed a "Supplemental Questionnaire as to [RFC]" dated April 10, 2013.  Tr. 552-55.  She noted diagnoses of bipolar, OCD and ADHD, listed Plaintiff's medications, including that she was tapering off Adderall, and opined that Plaintiff is severely limited in her ability to understand, carry out and remember simple instructions and respond appropriately to supervision or co-workers.  Tr. 552-54.  With respect to the ability to relate to others, to function socially, to maintain attention and concentration for simple, repetitive or varied tasks, Nurse Denuccio opined to "moderately-severe" limitations.  Tr. 553-55.  While acknowledging that Plaintiff was still drinking beer twice a week and had only just begun to taper off Adderall, Nurse Denuccio concluded that these severe and moderately severe limitations are not affected by substance abuse.  Tr. 552, 555.  In response to the question about pain, Nurse Denuccio opined that Plaintiff has fibromyalgia supported by clinical findings, which causes pain that limits her ability to perform tasks.  Tr. 555.

The second treating source opinion is from Plaintiff's new psychiatrist from QBH, Dr. Jacobs, who completed a RFC opinion dated April 25, 2013; like Nurse Denuccio, he had seen Plaintiff only once prior to completing the form, although he also saw her on the day he filled in the form.  Tr. 580-83.  In it, he opined that Plaintiff has severe limitations in her ability to relate to others, function socially, respond appropriately to supervision and co-workers, respond to customary work pressures and maintain attention and concentration needed to perform simple tasks repeatedly over an eight-hour day, and moderately-severe limitations in her ability to understand, carry out, and remember simple instructions.  Tr. 581-82.  He recorded her diagnoses

as "bipolar severe, receptive LD, MDD, GAD." Tr. 580. Dr. Jacobs left blank the portion of the form that allowed him to explain his opinions. Tr. 581-83.

The final expert, psychiatrist Dr. Stuart Gitlow, testified at Plaintiff's June 2013 hearing. Tr. 41-52. He opined that it remains unclear whether Plaintiff has had a period of sobriety sufficient to untangle any underlying mental impairment from the limitations caused by polysubstance abuse, including alcohol, marijuana and the unusual mix of prescribed medications (stimulants and sedatives simultaneously). Tr. 42-43, 48-49. Based on the evidence establishing that Plaintiff had not achieved sobriety, he testified that the only confirmed diagnosis is polysubstance abuse. Tr. 43-44. He also opined that active use of psychoactive substances, as reflected in Plaintiff's record, can cause the described symptoms of OCD and depression. Tr. 43. More importantly, while acknowledging Plaintiff's symptoms, Dr. Gitlow also observed that most of the objective findings made during the many mental status examinations in the record do not demonstrate that Plaintiff has significant functional limitations. Tr. 43-45. On cross-examination, Dr. Gitlow agreed that the record is replete with objective observations consistent with Plaintiff's symptoms, such as OCD (raw hands from use of wipes), anxiety (embarrassment over how she is perceived by others) and depression (self-isolation). Tr. 46-48. However, he persisted in his view that, whatever symptoms Plaintiff might have, the record does not reflect that they cause significant functional limitations. Tr. 51.

## II.   Travel of the Case

Plaintiff applied for DIB and SSI on March 6, 2012, alleging disability since October 24, 2008, although her counsel acknowledged at that hearing that she is actually alleging disability only from the date of the prior adverse decision (August 8, 2011). Tr. 40, 102, 114, 264. The Commissioner denied Plaintiff's claims initially and on reconsideration. Tr. 160-70. At the

hearing before the ALJ, on June 25, 2013, Plaintiff was represented by counsel and testified, as

did the medical and vocational experts.  Tr. 36.  In a written decision dated July 12, 2013, the

ALJ found that Plaintiff had not been disabled under the Act since her alleged onset date of

October 24, 2008.  Tr. 18-35.  The Appeals Council denied Plaintiff's request for review on

August 4, 2014, making the ALJ's decision the final decision of the Commissioner subject to

judicial review.  Tr. 1-5.  Plaintiff timely filed this action.

### III.     The ALJ's Hearing and Decision

At the June 25, 2013, hearing, Plaintiff testified that she has lived with her parents for the

past three years.  Tr. 52.  She leaves her house on average once a week, when she goes to her

grandmother's house to help out or goes to appointments.  Tr. 59-61.  She visits with her best

friend every other week and talks to him on the phone twice a week; they go grocery shopping

together once a month.  Tr. 60, 69.  Once a week, she visits with her boyfriend of eleven years.

Tr. 69-70.  She resumed attendance at church about two months before the hearing after a two-

year hiatus due to anxiety; she attends mass and sings in the choir.  Tr. 70-72.  She is able to do

the dishes, vacuum, dust, do laundry and take care of a Labrador, feeding and walking it four

times a week, usually at night to avoid seeing other people.  Tr. 72-76.  In explaining why she

cannot work, she testified that anxiety about leaving the house is her biggest problem, which has

caused a history of being late, in addition to her obsessions, which interfere with task

completion.  Tr. 55.

In his decision, the ALJ found that Plaintiff remained insured through December 31,

2013.  Tr. 19.  At Step One of the sequential evaluation process, he concluded that Plaintiff had

not engaged in substantial gainful activity since October 2008, the alleged onset date.  Tr. 21.  At

Step Two, the ALJ found that Plaintiff had established the medically determinable impairments

of anxiety and depressive disorder and polysubstance dependence.  Tr. 21.  At Step Three, he found that none of these impairments met or medically equaled any Listing in severity.  Tr. 21-22.

At Step Four, based on consideration of the entire record, including certain records from the prior application (Butler Hospital, the Kent Center and Dr. Turchetta, the state agency consultative examining psychologist), the ALJ made his RFC finding that Plaintiff can perform a full range of work at all exertional levels but with nonexertional limitations, including that she is limited to understanding, remembering and carrying out simple, routine, repetitive tasks, with breaks every two hours, and is restricted to no interaction with the public and to occasional work-related, non-personal, non-social interaction with co-workers and supervisors involving no more than brief exchange of information or hand-off of product.  Tr. 22.  In making this RFC determination, the ALJ found that neither the RFC opinion of Nurse Denuccio nor that of Dr. Jacobs was entitled to significant probative weight.  Tr. 28.  He also found that Dr. Gitlow's opinion that the only supportable diagnosis is polysubstance abuse and that Plaintiff has no functional limitations is inconsistent with the treating records; he declined to afford it significant probative weight.  Tr. 29.  However, the ALJ accepted the limitations found by Drs. Gordon and Hughes, the state agency reviewing psychologists, and afforded significant probative weight to them.  Tr. 29.  In assessing the severity of Plaintiff's symptoms, the ALJ found that her statements are not entirely credible based on the inconsistency between her testimony and statements about her symptoms and her many generally unremarkable mental status examinations, her many GAF assessments in the moderate range, her ability to engage effectively in many activities of daily living, some of which involve leaving the home, and her

many statements to medical providers, for example, that she is "feeling strong and happy."  Tr. 23-28.

In reliance on this RFC and the testimony of the vocational expert, the ALJ found that Plaintiff could not perform any of her past relevant work.  Tr. 29.  At Step Five, based on the response of the vocational expert to a hypothetical question, the ALJ found that Plaintiff can perform unskilled occupations that exist in significant numbers.  Tr. 29-30.  Accordingly, he found that she has not been disabled since October 24, 2008, through the date of his decision. Tr. 30.  Because of his finding of no disability, the ALJ did not examine the potential materiality of the many record references to drug and alcohol use.  Tr. 22 n.1.

## IV.   **Issues Presented**

Plaintiff's motion for reversal rests on three arguments.  First, she argues that the ALJ erred by independently interpreting raw data beyond the ken of a lay person.  Second, she claims that the ALJ did not evaluate properly the opinions of the testifying medical expert, the state agency reviewing sources and the treating opinions of Dr. Jacobs and Nurse Denuccio.  Third, she contends that the ALJ's credibility determination is not supported by substantial evidence.

## V.   **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).  Thus, the

Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.

The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of

the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 404.1529(a).[8]

The Court must reverse the ALJ's decision on plenary review if the ALJ applies incorrect

law or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law

was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord

Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where

all of the essential evidence was before the Appeals Council when it denied review and the

---

[8] The SSA has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite to one set only. See id.

evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276

F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but

also was insufficient for district court to find claimant disabled).  Where the Court cannot discern

the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow

an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir.

2001).  On remand under Sentence Four, the ALJ should review the case on a complete record,

including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)

(necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus

loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new
> evidence which is material and that there is good cause for the failure to
> incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is

new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) that there

is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six remand, the parties must return to the Court to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.     Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.      The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### B.     Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(c).  A treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).  If a treating source is not accorded controlling weight, the ALJ must apply the factors listed in 20 C.F.R. § 404.1527(c).  As SSR 96-2p provides:

> The notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188 (July 2, 1996).  The regulations confirm that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  However, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or

laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

A treating source who is not a licensed physician or psychologist[9] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4. The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC, see 20 C.F.R. §§ 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the

---

[9] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs.,

816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### C.    Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at

195.  A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349,

1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding."

Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d

1251, 1255 (11th Cir. 1983)).

### D.    Substance Abuse

Disability benefits are not available if alcohol or drug abuse is a contributing factor

material to the determination of disability.  42 U.S.C. § 423(d)(2)(C); Brown, 71 F. Supp. 2d at

29; 20 C.F.R. § 404.1535(b).  If the claimant is disabled and there is medical evidence of

alcoholism or substance addiction, the ALJ must determine the impact of the addiction on the

claimant's disability.  See 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535(a).  "The 'key factor'

to be considered, in fact the only factor mentioned in the regulations, is whether the claimant

would still be disabled absent the drug addiction or alcoholism."  Brown, 71 F. Supp. 2d at 35;

<u>see also</u> 20 C.F.R. § 404.1535(b)(1).  Effective on March 22, 2013, a new policy interpretation issued clarifying how the Commissioner determines whether drug addiction and alcoholism is material to the finding that a claimant is disabled, requiring that benefits be denied.  SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013).

## VII.   <u>Application and Analysis</u>

### A.   **Constructive Reopening of Prior Application**

The first issue that this Court must address is one not squarely framed by the parties – whether the period of disability covered by this appeal is the full period beginning on October 24, 2008, or the more limited period beginning August 9, 2011, the day following the prior ALJ's decision.

The relevant background may be briefly summarized.  Despite having an attorney, Plaintiff did not appeal from the adverse decision of the first ALJ.  And although her new applications claimed disability back to the original onset date, at the second hearing, her new attorney stated, "So, she's alleging disability at this point from the date after the [prior] decision to the present."  Tr. 40.  With no request to reopen, the ALJ did not rule on reopening. Nevertheless, without explaining why, his decision evaluates all of the medical evidence, some of which goes back to the original onset date.  Instead of relying on *res judicata* as the basis for finding no disability for the period from the original onset, October 24, 2008, through the date of the first adverse decision, August 9, 2011, he made a finding of no disability for the entire period from October 24, 2008, to the date of his decision.  Tr. 30.

Before this Court, Plaintiff has sustained her agnosticism on reopening.  Her motion for reversal did not ask this Court to find that the ALJ had waived *res judicata* and constructively reopened.  In her motion to affirm, the Commissioner acknowledged that the ALJ's ruling on the

entire period is potentially an error but also points out that there no prejudice to the extent that

the ALJ effectively has afforded review of a previously denied period.  ECF No. 10 at 3 n.1.  In

the face of the Commissioner's discussion of the issue, Plaintiff maintained her silence; while

she filed a reply addressing other issues raised by the Commissioner's motion, she did not argue

that the ALJ's decision amounts to constructive reopening.

The applicable law is plain: unless the prior period is reopened, the *res judicata* effect of

the prior ALJ's decision operates as a bar to review of the determination of no disability for the

period up to the date of that decision.  Phan v. Colvin, No. CA 13-650L, 2014 WL 5847557, at

*16-17 (D.R.I. Nov. 12, 2014); Cardin v. Colvin, C.A. No. 13-170-ML, 2014 WL 2533184, at *4

(D.R.I. June 5, 2014).  It is also plain that, when there is a prior application and the ALJ does not

address reopening, administrative *res judicata* may be waived when an ALJ, considering a new

application, "reviews the entire record . . . and reaches a decision on the merits" for the period

beginning on the original onset date from the earlier application.  Kane v. Heckler, 776 F.2d

1130, 1132 (3d Cir. 1985); see Morin v. Sec'y of Health & Human Servs., 835 F. Supp. 1414,

1422 (D.N.H. 1992) (ALJ constructively reopens prior claim by making new merits decision);

Guy v. Sullivan, 736 F. Supp. 1255, 1259 (W.D.N.Y. 1990) (when ALJ reviews record for entire

period and finds that disability onset date is same as in prior application, there is *de facto*

reopening of prior claim).  Simply reviewing medical evidence from the prior period is not

enough.  Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1138–39 (1st Cir. 1988).

However, if the ALJ renders a decision on the merits for the entire period of alleged disability,

the reviewing Court may consider the entire period.  See Byam v. Barnhart, 336 F.3d 172, 180

(2d Cir. 2003).

Despite the Plaintiff's failure to ask to reopen, I find that the ALJ did more than just consider medical evidence from the prior period; rather, he expressly resolved the merits of Plaintiff's application for the entire period from October 24, 2008, to the date of his decision. This is sufficient to waive administrative *res judicata*. Morin, 835 F. Supp. at 1422. Accordingly, I have examined the ALJ's decision with respect to the entire period to determine whether there is error requiring remand or reversal.[10]

## B.   ALJ's RFC Finding

Plaintiff's attack on the ALJ's RFC finding is premised on the proposition that reliance on her mental status examination findings, which are generally unremarkable, and on her GAF scores, which generally fall into the moderate range, amounts to medical judgments by a lay person making an uneducated guess as to the meaning and validity of the raw data. These arguments are grounded in settled law that an ALJ cannot make medical judgments. Nguyen, 172 F.3d at 35; see Renaud v. Colvin, No. CA 14-483-M, 2015 WL 4006183, at *6 (D.R.I. July 1, 2015) (impermissible for ALJ to find complaints were inconsistent with "good recall, memory, concentration and thought," in the absence of expert evidence to that effect); Forbes v. Colvin, No. CA 14-249-M-PAS, 2015 WL 1571153, at *11 (D.R.I. Apr. 8, 2015) (ALJ lacked expert opinion to support relationship between raw evidence and claimant's ability to stand or walk).

---

[10] In so doing, while I have reviewed the decision of the prior ALJ as part of the relevant background, I have not performed a *sua sponte* scouring of it for error because Plaintiff has not pointed to any aspects of it that support her argument that this Court should reverse.  See Vineberg v. Bissonnette, 529 F. Supp. 2d 300, 305 (D.R.I. 2007); see also Collins v. Colvin, No. 2:14-CV-01429-JEO, 2015 WL 5288882, at *3 (N.D. Ala. Sept. 8, 2015) (failure to offer argument or evidence in support of claim constitutes waiver) (citing cases).  Nevertheless, it was carefully reviewed in light of the overall record; based on that review, I did not find that the prior ALJ committed any error, never mind error as to which justice requires that it be raised despite the failure of the claimant to make the argument.  Silva v. Colvin, No. CA 14-301 S, 2015 WL 5023096, at *13 (D.R.I. Aug. 24, 2015); see Fowler v. Comm'r of Soc. Sec., No. 12–12637, 2013 WL 5372883, at *3 n.5 (E.D. Mich. Sept. 25, 2013); Moore v. Astrue, No. CV–10–36–GF, 2011 WL 1532407, at *3-4 (D. Mont. Mar. 30, 2011) (when traumatic brain injury caused seizure disorder and no medical records refute claimant's testimony about seizure frequency, court *sua sponte* directs consideration of epilepsy listing on remand); Wilting v. Astrue, No. 09–CV–01207–WYD, 2010 WL 3023387, at *7 (D. Colo. July 29, 2010) (when court's duty to scrutinize the record uncovers errors, court should raise them *sua sponte*); Choquette v. Astrue, No. C.A. 08–384A, 2009 WL 2843334, at *10 n.2 (D.R.I. Aug. 31, 2009) (when court encounters error plaintiff did not raise, it is compelled to raise it *sua sponte*).

At bottom, the fatal flaw in Plaintiff's construct is that the ALJ's RFC assessment was not based solely on his lay interpretation of the mental status examinations and the GAF scores. Rather, he gave significant weight to the opinion evidence from reviewing psychologists Drs. Gordon and Hughes; these medical experts interpreted all of the available medical evidence, including the results of the mental status examinations and the GAF scores.  They both found moderate impairments in the spheres of daily living, social functioning and the ability to maintain concentration, persistence and pace, as well as in most of Plaintiff's work-related functions.  Tr. 108-11, 121-24.  These opinions derive from the examination by these experts of the entire medical record as of the date of their respective examinations and provide substantial support for the ALJ's conclusions, including that Plaintiff lacked credibility in claiming more severe limitations, that the treating source opinions regarding more severe limitations are inconsistent with the record, and ultimately, that Plaintiff retains the residual capacity to work. Thus, far from speculating about the meaning of the mental status findings and the GAF scores, the ALJ's RFC assessment and related determinations properly rest on the interpretations of these medical experts.

What remains is to evaluate whether, despite the interpretations of these experts, the ALJ's reliance on and discussion of the mental status examinations and the GAF scores is nevertheless tainted by legal error.  That is the question to which I next turn.

Plaintiff's primary argument regarding the ALJ's repeated references to the results of Plaintiff's many mental status examinations focuses on the use of the term "unremarkable" to describe mental status findings that record observations of matters that are not of concern. Plaintiff contends that the lay ALJ lacks the training to draw such conclusions and that, when

these improper conclusions are stripped away, the record is devoid of substantial evidence

inconsistent with the opinion of treating psychiatrist Dr. Jacobs.

This critique – that the ALJ acted beyond his ken in characterizing the mental status

examination results as generally "unremarkable other than an anxious mood and/or affect and

obsessive thought content" – does not hold water.  Tr. 23.  The ALJ's use of "unremarkable"

does not reflect an improper lay judgment, but rather, is an appropriate term to summarize what

are positive or neutral mental status observations.  Indeed, in at least one instance,

"unremarkable" reflects the precise term actually used by the medical provider.  See, e.g., Tr.

335-36 (Butler mental status examination mostly "unremarkable" except "Insight/Judgment:

improved").  Other providers clearly characterize their findings so as to indicate which

observations are normal or within normal limits, that is, "unremarkable," and which observations

raise matters of concern.  See, e.g., Tr. 343-46 (Dr. Turchetta's mental status examination

findings within normal limits except judgment of social situations); Tr. 378-79 (Kent Hospital

mental status examination all positive except "some psychomotor anxiety/agitation" and "insight

and judgment are improved"); Tr. 434 (Thundermist mental status examination all positive

except "Affect: anxious . . . .  Insight: fair.  Judgment: fair . . . .  Thought Content: obsessive").

The use of the term "unremarkable" by a lay evaluator to characterize such positive or neutral

mental status findings is commonplace and appropriate.  See, e.g., Burgos v. Colvin, No. CA 13-

486 ML, 2014 WL 3905707, at *9 (D.R.I. Aug. 11, 2014) ("mental status examinations were

otherwise unremarkable"); Velazquez v. Astrue, No. CA 11-535S, 2013 WL 1415657, at *3

(D.R.I. Feb. 22, 2013), rep. & rec. adopted sub nom., Velazquez v. Colvin, No. CA 11-535 S,

2013 WL 1415586 (D.R.I. Apr. 8, 2013) ("mental status examination was unremarkable");

Matos v. Astrue, 795 F. Supp. 2d 157, 165 (D. Mass. 2011) ("ALJ added that the findings of [claimant's] physical and mental status examinations were on the whole 'unremarkable'").

With no error tainting the ALJ's well-supported conclusion that Plaintiff's mental status examination results are largely "unremarkable," there is also nothing improper in the ALJ's reliance on such "unremarkable" results.  Little v. Colvin, No. 2:13-CV-365-GZS, 2014 WL 5782457, at *7 (D. Me. Nov. 6, 2014) (ALJ properly considered mental status examination results of treating providers in rejecting dire level of restrictions in opinion proffered by claimant); Smith v. Astrue, 717 F. Supp. 2d 164, 171 (D. Mass. 2010) (hearing officer's decision to discredit testimony properly rested on medical records, including relative normalcy of her mental status examinations); Lacroix v. Barnhart, 352 F. Supp. 2d 100, 110, 112 (D. Mass. 2005) (hearing officer is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians," including mental status examination results).  Plaintiff's argument to the contrary is unavailing.

Plaintiff's attack targeted at the ALJ's reliance on Plaintiff's GAF scores is equally lacking in merit.  She focuses her criticism on the ALJ's acceptance of Plaintiff's treating source GAF scores between 55 and 60, which reflect moderate impairment, together with the occasional dips to 50, particularly at the end of the treating relationship at Thundermist and the initial appointment at QBH.  Tr. 23-27.  Plaintiff contrasts the ALJ's reliance on these largely moderate GAF scores with the ALJ's rejection of Dr. Turchetta's GAF of 48,[11] Tr. 345, and of Kent Hospital's intake GAF of 30, Tr. 404.  To highlight what she contends is error, Plaintiff points to the ALJ's footnote, which she contends amount to a justification of treating GAF scores of 50 or below as unreliable, while affording greater weight to higher GAF scores.  Tr. 24 n.2.  All of this

---

[11] Dr. Turchetta also opined that Plaintiff's "highest GAF: 52," which is in the moderate range.  Tr. 345.

is improper, she contends, because GAF scores are not opinion evidence but raw medical data, beyond the ALJ's lay capacity to interpret.

The Achilles heel in Plaintiff's contention is that the ALJ's reliance on Plaintiff's GAF scores is entirely consistent with the guidance referred to by Plaintiff, the SSA Admin Message,[12] which makes clear that adjudicators may continue to receive and consider GAF scores as "opinion evidence," despite the rejection of the use of GAF by DSM–5.  Phan, 2014 WL 5847557, at *11-12.  Plaintiff is right that a GAF score is "never dispositive of impairment severity" because it is a "snapshot opinion about the level of functioning" to be considered with all the other evidence about a person's functioning.  SSA Admin Message at 4.  However, she is completely wrong when she argues that GAF scores are raw medical data beyond the ken of an ALJ.  SSA Admin Message at 1 ("[w]e consider a GAF rating as opinion evidence" to be weighed by ALJ); see Phan, 2014 WL 5847557, at *11.  Rather, a GAF score reflects the opinion of the source providing the rating.  SSA Admin Message at 4.

The guidance in the SSA Admin Message also makes clear that there is no error in the ALJ's decision to give more weight to the moderate scores assigned by Nurse Jankowski, who saw Plaintiff regularly over the course of several years, while giving less weight both to Dr. Turchetta, who saw Plaintiff only once for a consultative examination, and to the Kent Hospital intake GAF, which was assessed immediately following Plaintiff's ingestion of Vicodin.  See SSA Admin Message at 1 (GAF score's weight depends on whether it "is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise").  The ALJ properly discounted the former as inconsistent with Dr. Turchetta's largely normal mental status findings and the latter because it is an anomaly "in the context of substance abuse."  Tr. 24-25 n.3.  The ALJ's treatment of these scores by assigning them more or less weight in the context of

---

[12] See n.2, *supra*.

the entire record is entirely appropriate and does not amount to improper cherry-picking.[13]  See Resendes v. Astrue, 780 F. Supp. 2d 125, 137–39 (D. Mass. 2011) (overreliance on GAF scores can occur when ALJ fails to consider record as a whole); Truax v. Barnhart, 1:05-cv-1913, 2006 WL 3240523, at *6 (S.D. Ind. Sept. 29, 2006) (no error at Step Two when ALJ reviews GAF scores in light of entire body of available evidence).

In sum, I find that the ALJ did not err in his reliance on and reference to Plaintiff's largely unremarkable mental status examination results and her largely moderate GAF scores in making his credibility finding, in contrasting the treating opinion evidence with the treating medical record and, most importantly, in crafting his RFC finding.

### C.    Opinion Evidence

Plaintiff argues that the ALJ stumbled in his treatment of the medical expert opinion from Dr. Gitlow, the reviewing opinions of the state agency psychologists, Drs. Gordon and Hughes, and the treating opinions of psychiatrist Dr. Jacobs and Nurse Denuccio.  She claims that his decision fails to comply with 20 C.F.R. § 404.1527(c)-(e), which requires an ALJ to evaluate all of the opinion evidence in the record.

### 1.    Dr. Gitlow

While Plaintiff does not quarrel with the ALJ's decision not to afford significant probative weight to Dr. Gitlow's opinion that Plaintiff's unabated use of alcohol, marijuana and amphetamines during most of the relevant period leaves polysubstance abuse as the only objectively supportable diagnosis, she contends that the decision should have taken cognizance of what she characterizes as Dr. Gitlow's "admissions" on cross examination.  For example,

---

[13] It must be emphasized that this is not a case where the ALJ has improperly deployed the GAF opinion evidence to resolve inconsistencies in the record.  See Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (improper for ALJ to use GAF scores as a basis for reconciling conflicting evidence in record).  Rather, this GAF evidence is consistent with the treating record, with the mental status evaluations, with Plaintiff's statements to providers about her activities and, most importantly, with the opinions of the reviewing psychologists.

under questioning by Plaintiff's counsel, Dr. Gitlow acknowledged that the record reflects

Plaintiff's raw hands, her complaints that she was embarrassed by her weight, her fear of being

judged, her self-isolation, her trouble with sleep and her difficulty getting out of the house and

always being late.  Tr. 46-48.  Dr. Gitlow agreed that these could be symptoms of OCD, anxiety

and depression, substance abuse or side effects of Plaintiff's "unusual combination" of stimulant

and sedative medications, but emphasized that the record does not reflect that these symptoms

imposed significant limitations on Plaintiff's ability to function.  Tr. 43, 45, 48-51.

There is no material inconsistency between the portions of Dr. Gitlow's testimony on

which Plaintiff now focuses and the ALJ's findings.  Dr. Gitlow testified that Plaintiff appears to

have certain symptoms that he believes do not cause functional limitations; the ALJ credited that

Plaintiff suffers from these symptoms and, giving weight to the reviewing psychologists and not

to Dr. Gitlow regarding their impact, found that they do cause the functional limitations that he

wove into his RFC.  Tr. 21.  This is not error.  See Zamorano v. Astrue, No. EDCV08-

01163AJW, 2009 WL 1769581, at *3 (C.D. Cal. June 15, 2009) (ALJ entitled to resolve

conflicts between testifying medical expert and other non-examining sources).  And even if this

Court were to find error, which I do not, it would not require remand because assigning

significant probative weight to Dr. Gitlow's cross-examination testimony would have no impact

on the ALJ's decision.

### 2.    Drs. Gordon and Hughes

Plaintiff claims that the ALJ erred in affording significant probative weight to the state

agency psychologists' RFC opinions because they are inconsistent with the treating notes and

with Plaintiff's statements regarding the severity of her limitations.  In support of this

asseveration, she relies on an array of arguments: that the reviewing psychologists both noted

that there had been one or two episodes of decompensation, yet the ALJ's decision says that there are none; that Dr. Hughes affirmed Dr. Gordon on reconsideration without adding any new analysis except for his comment that Plaintiff's statement that her condition had worsened was "rather loquacious" and not supported by the medical evidence; and that there is an inconsistency between their conclusion that Plaintiff's "allegations of limitations are overall credible," Tr. 96, 122, and Dr. Hughes's rejection as incredible of her "rather loquacious" statement that her condition had worsened.[14]

Plaintiff is right that the ALJ made an obvious error in failing accurately to record the reviewing psychologists' finding that Plaintiff experienced one or two episodes of decompensation. Specifically, the ALJ's Step Three decision that Plaintiff's impairments do not meet or equal any Listing relied in part on the finding that Plaintiff had "no episodes of decompensation." Tr. 22. This is simply wrong – both of the reviewing psychologists expressly found, "Episodes of Decompensation . . . : One or Two."[15] Tr. 96, 108, 121, 134. However, this mistake is inconsequential to the ALJ's decision in that – whether there is no episode or there are one or two episodes – Plaintiff's decompensation is not material to the ALJ's Step Three finding. Only if Plaintiff had experienced at least <u>three</u> episodes within one year would it matter, and then only if the ALJ also found marked difficulty in at least one other sphere. <u>See</u> 20 C.F.R. Pt. 404,

---

[14] Plaintiff presents other arguments that are not worthy of extended treatment. For example, she complains that the ALJ's RFC included two non-exertional limitations not supported by the record: restricting her to simple tasks with breaks every two hours and to limited interaction with co-workers and supervisors and no interaction with the public. This makes no sense – both of these limitations come directly from the opinions of Drs. Gordon and Hughes. Tr. 98, 110, 123-24, 136-37. Similarly, she contends that the reviewing psychologists failed to opine whether Plaintiff was capable of performing work outside of her home on a regular basis without an unacceptable number of absences. This argument also holds no water – Drs. Gordon and Hughes specifically opined that she is moderately limited in her ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and in her ability to "complete a normal workday and workweek." Tr. 97-98, 109-10, 123, 136.

[15] Ironically, Plaintiff herself made a comparable mistake – in her argument in support of her motion, she erroneously recites that Drs. Gordon and Hughes found "two or more" episodes of decompensation. ECF No. 7-1 at 27.

Subpt. P, App. 1 §§ 12.00.C.4, 12.04, 12.06 (Listings for affective and anxiety disorders require

at least two of the following: marked limitations in activities of daily living, in social

functioning, or in maintaining concentration, persistence, or pace or at least <u>three</u> episodes of

decompensation within one year); <u>see also</u> <u>Stokes v. Astrue</u>, 274 F. App'x 675, 681 (10th Cir.

2008).  In short, if this be error, it is harmless error.  <u>Rivera v. Comm'r of Soc. Sec. Admin.</u>, No.

12-1479, 2013 WL 4736396, at *11 (D.P.R. Sept. 3. 2013) ("A[n] ALJ's error is harmless where

it is 'inconsequential to the ultimate nondisability determination.'") (quoting <u>Molina v. Astrue</u>,

674 F.3d 1104, 1115 (9th Cir. 2012)).

Plaintiff's other two arguments may be given short shrift.  With no suggestion of

substantive error, she attacks Dr. Hughes for his use of the well-accepted practice of affirming

Dr. Gordon on reconsideration without repeating the analysis; this not only is not improper but is

appropriate husbanding of the Social Security Administration's scarce resources.  It certainly is

not grounds for remand.  Inconsistently, Plaintiff also attacks Dr. Hughes for his comment that

Plaintiff's statement that her condition had worsened was "rather loquacious" and not supported

by the additional medical evidence.  This comment simply confirms that Dr. Hughes did review

the file and that he gave careful consideration to Plaintiff's claim that her condition had

worsened; in short, that he did precisely what Plaintiff argues he did not do.  Further, there is no

inconsistency between the conclusions of both psychologists that, based on their file review as of

the initial assessment on July 17, 2012, Plaintiff's "allegations of limitations are overall

credible," and Dr. Hughes's rejection as incredible of her subsequent "rather loquacious"

statement in support of reconsideration.  It is illogical to posit, as Plaintiff argues, that the

opinions of the psychologists that her statements to treating providers as reflected in the medical

record are "overall credible" compels the conclusion that her more current claim in connection with these applications that she cannot leave her home must also be credible.

Based on this Court's review of the record, it is clear that the two reviewing psychologists both found that Plaintiff's limitations are moderate and that the medical history, as detailed in the ALJ's decision, is consistent with their conclusions.  I find that the ALJ committed no material error in using the RFC opinions of Drs. Gordon and Hughes as substantive evidence supporting the limitations incorporated in his RFC finding.

### 3.      Dr. Jacobs and Nurse Denuccio

Plaintiff asks this Court to find error in the ALJ's discounting of the opinions of the two treating sources from QBH, psychiatrist Dr. Jacobs and Nurse Denuccio.  Her argument founders on the reality that her prior treating relationship with each consisted of a single interaction.  Dr. Jacobs wrote his opinion at his second appointment with Plaintiff, while Nurse Denuccio filled out an RFC form after only one session.  Unlike the reviewing psychologists, Drs. Gordon and Hughes, neither Dr. Jacobs nor Nurse Denuccio had the benefit of seeing Plaintiff's longitudinal treating record.  Although Dr. Jacobs did perform some testing during his first appointment with Plaintiff, that is not enough to convert him into the kind of treating source to whom special consideration must be afforded.  See Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (opinion of physician who had only examined the claimant "once or twice" not entitled to the extra weight of that of treating physician); Hobart v. Astrue, No. 11-cv-151-PB, 2012 WL 832883, at *7-8 (D.N.H. Feb. 9, 2012) (when treating source saw claimant just twice, opinion should be accorded limited weight); see also 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

The ALJ properly relied on the extremely limited treating relationship as one of the good reasons for not affording significant weight to Dr. Jacobs's opinion.  Tr. 28.  The ALJ also found that Dr. Jacobs's extreme findings – that Plaintiff had "severe" or "moderately severe" limitations in virtually every aspect of social and occupational functioning – are unsupported by and inconsistent with the other record evidence, including Plaintiff's mental status examinations, treatment history and activities of daily living.  Tr. 28; see 20 C.F.R. § 404.1527(c)(2),(4).  For example, the ALJ correctly noted that Dr. Jacobs's opinion that Plaintiff is severely limited in her ability to maintain attention and concentration for simple tasks is inconsistent with the lack of negative findings regarding attention or concentration during her many mental status examinations.  Also inconsistent is his treating note reflecting his decision that Plaintiff should taper off Adderall and that her last use of marijuana had occurred only two weeks prior to when he first saw her, and his form opining that the use or abuse of these substances had no material impact on such extreme limitations.  Tr. 583.  It is noteworthy that, despite a form that asked him to explain the limitations to which he opined, Dr. Jacobs did little more than circle categories.  see 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The ALJ's good reasons for discounting Nurse Denuccio's RFC opinion are similar: the ALJ expressly noted the limited treating relationship (one appointment) and appropriately explained that her opinion of severe and moderately-severe limitations is inconsistent with the other record evidence, including the numerous mental status examinations, Plaintiff's treatment history and her activities of daily living.  One such glaring inconsistency is Nurse Denuccio's opinion on the form that Plaintiff has "fibromyalgia," "consistent with clinical findings," yet there is absolutely nothing in the record to support this assertion.  See Tr. 555.  Moreover, while

not mentioned by the ALJ, the Court observes that Nurse Denuccio is not an "acceptable medical source," so that her opinion would not be entitled to controlling weight in any event.  See 20 C.F.R. § 404.1513(a), (d); SSR 06-03p, 2006 WL 2329939, at *2.

I find no error in the ALJ's determination that the RFC opinions of Dr. Jacobs and Nurse Denuccio should not be afforded significant probative weight.

### D.      Credibility

Plaintiff's argument that the ALJ's credibility assessment is tainted by error is grounded in the premise that the medical record definitively establishes that she cannot function effectively outside the home because her only regularly reported activity was attendance at church.  Aside from the lack of substantive merit for this proposition, Plaintiff's attack on the ALJ's credibility determination ignores the duty of this Court "to tread softly, because '[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.'"  Cruz v. Astrue, No. CA 11-638M, 2013 WL 795063, at *16 (D.R.I. Feb. 12, 2013) (quoting Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)). The ALJ's credibility determination, which is based upon his observation of Plaintiff, including the evaluation of her demeanor and consideration of how her testimony fits in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.  Frustaglia, 829 F.2d at 195.  Only when critical aspects of the ALJ's credibility determination are based on suppositions that do not constitute substantial evidence is remand necessary.  Morin, 835 F. Supp. at 1427 (credibility finding not supported by substantial evidence cannot stand).

Here, the ALJ's credibility finding is well explained by specific reasons that are amply supported by substantial evidence.  For example, he contrasted Plaintiff's claim that she is

incapable of leaving home with the evidence of activities outside the home,[16] her largely normal mental status examinations results and the many GAF assessments in the moderate range. Tr. 23-27; see SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996). The ALJ properly relied on evidence of Plaintiff's failure to comply with prescribed treatment, such as continuing to use alcohol while taking prescribed psychiatric medications. Tr. 27-28; see SSR 96-7p, 1996 WL 374186, at *7. The ALJ properly observed that Plaintiff's claims of severe limitations are belied by the limited nature of her mental health treatment; for much of the relevant period, Plaintiff received only medication management from nurses, physician assistants and social workers at Thundermist. See Tr. 27-28; see also SSR 96-7p, 1996 WL 374186, at *7 ("individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

I find no error in the ALJ's adverse credibility finding.

## VIII.   Conclusion

Based on the foregoing, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 7) be DENIED and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a

---

[16] Plaintiff contends that the ability to perform activities of daily living does not equate to the ability to perform full time work, citing such cases as Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). She is right, but this is beside the point. The ALJ relied on Plaintiff's competence at a wide range of daily activities – walking her dog, preparing simple meals, doing laundry, vacuuming, cleaning, gardening, limited shopping, handling personal finances, playing computer games and socializing with her best friend and boyfriend – to undermine the credibility of her claim that she suffers from extreme functional limitations. Tr. 28. He did not use them as the sole support for the finding that she is capable of work.

timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 5, 2015